Filed 1/9/24  P. v. Moreno CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082204 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF105634) |
| ALFREDO MORENO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Timothy F. Freer, Judge.  Reversed and remanded with directions.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman, and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

Alfredo Moreno appeals from an order denying his request for resentencing pursuant to Penal Code section 1170.95, now section 1172.6,

following an evidentiary hearing.[1]  Moreno asserts the order must be reversed because the trial court's findings do not support liability for murder under the current law, as amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437).  It is undisputed that Moreno was not the actual shooter, but the trial court found that the evidence showed that Moreno must have known that his co-defendant planned to kill the victim.  Among other assertions, Moreno argues that, because the trial court expressly repudiated his testimony that he believed they were going to commit a robbery, he could not be convicted as "a major participant *in the underlying felony* [who] acted with reckless indifference to human life" under section 189, subdivision (e)(1)(3).  We agree.  And because the trial court did not make sufficient findings to support any other now-viable theory of murder, we conclude that the order must be reversed and the matter remanded to the trial court for further proceedings.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     *The Underlying Crime and Conviction*

As is often the case in appeals from petitions under section 1172.6, the facts of the underlying crime were set forth in detail in a prior direct appeal.[2] (See *People v. Ocegueda* (Sept. 18, 2007, E038856) [unpub. opinion].)  Because

---

[1]     All further statutory references are to the Penal Code.  Assembly Bill No. 200 (Stats. 2022, ch. 58, § 10) renumbered section 1170.95 to 1172.6, effective June 30, 2022.  We cite to the current statute herein.

[2]     Like the trial court, we have reviewed and rely upon the transcripts from the underlying trial in our own analysis.  (See *People v. Clements* (2022) 75 Cal.App.5th 276, 292 ["[T]he Legislature has decided trial judges should not rely on the factual summaries contained in prior appellate decisions when a section [1172.6] petition reaches the stage of a full-fledged evidentiary hearing."]; accord, *People v. Cooper* (2022) 77 Cal.App.5th 393, 400, fn. 9; *People v. Langi* (2022) 73 Cal.App.5th 972, 979–980.)

the present appeal turns primarily on the alignment between the trial court's findings at the conclusion of the section 1172.6, subdivision (d) evidentiary hearing, and the elements necessary to prove the still-available theories for accomplice murder liability, we provide only a brief summary of the underlying crime.

Moreno was convicted of second-degree murder in April 2003 for his role in the death of Daniell Alonzo. It is undisputed that Moreno was not the actual killer, and that any liability was based solely on his role as an accomplice. The actual killer was Arturo Ocegueda. Moreno first met Ocegueda sometime around 1990, when Ocegueda began dating Moreno's older sister. Ocegueda and Moreno's sister had two children together before they eventually separated. Moreno was a child himself at the time, and Ocegueda would often play with him. Moreno continued to have a relationship with Ocegueda after the separation and would talk with Ocegueda when Ocegueda came to the house to visit his children. At the time of the murder, in June 2002, Moreno was approximately 21 years old and Ocegueda was approximately 28.

Ocegueda began dating the victim, Alonzo, in the summer of 2001, but Alonzo broke up with Ocegueda in May 2002 and asked him to move out of their shared apartment. Ocegueda made several threats to Alonzo that June. Despite being concerned by those threats, Alonzo agreed to go with Ocegueda to look at a car on the evening of the murder because she was having trouble with hers and needed a new one.

At around 8:00 p.m. on June 14, 2002, Ocegueda drove Alonzo, in her own car, to a remote location, under the pretext of looking at the new car, and shot her twice in the head at close range, causing her death. It is undisputed that Ocegueda left the scene after the killing and, at some point, Moreno

3

attempted to dispose of Alonzo's vehicle, but the precise details of Moreno's involvement at and around the time of the killing have changed over time.

The evidence at trial established that Moreno appeared at a cement plant in the area at around 9:00 p.m. on the night of the murder and asked an employee to call him a cab. The cab driver was ultimately unable to locate the cement plant so Moreno returned approximately 20 minutes later and asked to use the phone again, this time to call his mother. The cement plant employee noted that Moreno was wearing a jacket over a white T-shirt and that the T-shirt had what appeared to be a fresh blood stain on the back.

Alonzo's body was found in a field near the plant several days later, on June 17, 2002. The police identified Moreno as the individual who had appeared at the cement plant on the evening of the murder and arrested him on September 9, 2002. After being read his rights, Moreno agreed to speak to the police.

Moreno initially said that he got stranded by the cement plant when a girl that he was with got mad and kicked him out of her car. When the investigator told Moreno that the employee at the cement plant reported seeing a bloodstain on his clothing, Moreno said that he just happened to see an abandoned car in the area. He sat down in it, thinking about whether he should steal it, and quickly realized the seat was wet with blood so he decided to just walk away. The investigator continued to question Moreno's story and, eventually, Moreno said that "a guy" called and asked him to "get this car . . . and just get rid of it." The "guy" told Moreno where the car was and said that it would be open and running, and all he had to do was drive it away.

The People charged Moreno and Ocegueda with willful, deliberate, and premeditated murder, and further alleged as to each that they committed the

4

murder while lying in wait, within the meaning of section 190.2, subdivision (a)(15). They were tried together in 2005. At the conclusion of the evidence, the trial court instructed the jury with the standard instructions for murder, the lesser-included offense of second-degree murder, and on the aiding and abetting theory of murder liability. Although the People did not charge either defendant with robbery or conspiracy, the trial court also instructed the jury that a defendant could be guilty of murder if they were part of a conspiracy to commit one crime, and the charged crime of murder "was perpetrated by a co-conspirator in furtherance of that conspiracy and was a natural and probable consequence of the agreed upon criminal objective of that conspiracy."

During deliberations, the jury expressed confusion as to the definition of a "conspiracy" and whether they needed to find that the defendants agreed to commit murder. The court then gave a more complete instruction as to conspiracy, including that "[a] member of the conspiracy is not only guilty of the particular crime that to his or her knowledge his or her confederates agreed to and did commit but also is liable for the natural and probable consequences of any crime act of any coconspirator to further the object of the conspiracy, even though that crime act was not intended as a part of the agreed-upon objective and even though he had or she was not present at the time of the commission of that crime act."

The jury convicted Ocegueda of first-degree murder and found the lying-in-wait special allegation true as to him. It found Moreno guilty of the lesser included offense of second-degree murder, and found the lying-in-wait allegation *not* true as to him. The trial court sentenced Moreno to 15 years-to-life in prison.

5

**B.**   *Moreno's Parole Hearing Testimony*

On September 27, 2016, Moreno testified at a parole eligibility hearing. Moreno said that he met Ocegueda when he was about 11 years old. They would hang out and play basketball together when Moreno was younger, but after Ocegueda and Moreno's sister broke up, Moreno would only see Ocegueda about once a week. Moreno knew that Ocegueda was a drug dealer, and "every so often," Ocegueda would give him drugs to sell.

On the night of the murder, Ocegueda stopped by Moreno's mother's house and "start[ed] telling [Moreno] a story about a woman that he sold drugs with who set him up to be robbed. [Ocegueda] said he wanted to get her back. If [Moreno] would help him to get rid of her car." Moreno testified that he thought "get her back" meant that Ocegueda wanted to rob her, like she had done to him. Moreno explained that he "looked up to" Ocegueda and did not ask many questions. Moreno got in the car with Ocegueda and Ocegueda took him to a neighborhood where he said he wanted Moreno to be and told him that he would call him later.

Later, Ocegueda called Moreno and told him to go to Ocegueda's house. When Moreno got to Ocegueda's house, Alonzo pulled up and Ocegueda got in her car. Moreno followed in his own car to a dirt road. Ocegueda showed Moreno where to park, down a side road. Moreno got out of his car and started walking towards Alonzo's car. As he was walking, Moreno saw two gun flashes and heard two gunshots. When he got to Alonzo's car, Ocegueda was pulling Alonzo out of the car. Moreno was in shock. Ocegueda told Moreno to give him the keys to his car and Moreno did. Ocegueda then told Moreno to get rid of the car. Moreno jumped in the car and drove down the road, but he got lost and got the car stuck. That is when he walked to the cement plant to use the phone.

6

Moreno was unable to get a ride, so he walked into town and called his house again from a payphone. Ocegueda was at his house by then and came to pick him up. Ocegueda was upset that Moreno got the car stuck, and Moreno was upset that Ocegueda involved him in a murder. He did not call the police because he was a criminal and also in a gang.

The parole board denied Moreno's request for parole, and set the next parole suitability hearing in five years.

## C.   *Moreno's Petition for Resentencing*

In March 2021, Moreno filed a petition for resentencing pursuant to section 1172.6. He alleged that he was convicted of second degree murder under a natural and probable consequences theory and that he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019. The People stipulated that Moreno had made a prima facie showing and the trial court issued an order to show cause why Moreno should not be sentenced and set the matter for an evidentiary hearing.

In pre-hearing briefing, the People asserted Moreno's petition should be denied because Moreno remained guilty of murder under current section 189, subdivision (e)(3) as a major participant *in the robbery* with reckless indifference to Alonzo's life. They argued that Moreno helped plan the robbery, which involved luring Alonzo to an isolated area at night and that he did a "dry run" with Ocegueda. The People conceded there was no direct evidence that Moreno knew that Ocegueda had a gun, but asserted there was circumstantial evidence to support such an inference since Moreno knew that Ocegueda was a drug dealer, that he wanted to "get back" at Alonzo for ripping him off, and that drug dealers often resort to violence. Thus, the People asserted, Moreno knew the robbery plan posed a danger to Alonzo.

7

Finally, they asserted that Moreno did nothing to stop Ocegueda from going through with the plan and nothing to aid Alonzo after the shooting. The People did not assert that Moreno directly aided and abetted the murder.

In response, Moreno asserted that his statements at his parole hearing should be excluded as unreliable and that the evidence in the record of conviction was insufficient to prove beyond a reasonable doubt that he was a major participant in the robbery who acted with reckless indifference to human life.[3] He asserted that his mere agreement to participate in the crime by getting rid of the car was not sufficient to establish that he was a *major* participant, and that there was no evidence he knew that Ocegueda had a gun or a propensity for violence. Moreno argued further that he was not in the vehicle when the shooting occurred, that the victim was already deceased when he arrived on the scene, and that he had no real means to intervene to prevent the shooting or to render aid to Alonzo after it had occurred.

Neither party presented any additional testimony or evidence—beyond the record from the original trial and the transcript from the 2016 parole hearing—at the evidentiary hearing. After hearing additional argument from both sides, the trial court denied the petition. The trial court stated its reasoning on the record. It explained, in relevant part:

> "The Court is convinced beyond a reasonable doubt the defendant acted with reckless indifference to the victim, [Alonzo].

> "The Court is convinced beyond a reasonable doubt he was not only acting with reckless indifference with respect to the decedent's life, but he also was a major participant.

---

[3] As we discuss in more detail, *post*, the trial court did consider Moreno's statements to the parole board at the evidentiary hearing and Moreno does not raise the issue on appeal.

"The Court is convinced beyond a reasonable doubt that while the Defendant Moreno may not have originated the plan or formulated the plan or had the primary motive with respect to the killing of [Alonzo], that he willingly participated in the murder of [Alonzo]."

The trial court continued:

"The Court does not think it is likely or reasonable for individuals who have some criminal background and some criminal history, that the way to get back at another individual would be to commit a robbery where they can both—one or both be identified, and the item, the physical item of the robbery, would in fact be subsequently identified.

"If the motive for killing [Alonzo] was because she set up [Ocegueda], it would not be logical for any person—it doesn't require a great deal of education to infer that 'get back' means to kill, *because if it was to commit a robbery, that makes no sense.* That puts them in a vulnerable position that [Alonzo] could call law enforcement, could call individuals, call her confederates to identify [Ocegueda] or Defendant Moreno. That makes no sense to the Court.

"The only alternative, and logical alternative, was, after being set up, [Ocegueda], needing assistance to dispose of a vehicle, would logically need assistance, and that would be coming from someone that he could trust. *One typically does not commit the crime of murder*, does not execute another individual without having another trusted individual nearby.

"[¶] . . . [¶]

"So it makes no sense to the Court that [Ocegueda] and Defendant Moreno would be talking and inferring that 'get back' at somebody who set [Ocegueda] up would logically be that they were talking about getting back by committing a robbery."

(Italics added.)

After reciting extensively from the transcript of Moreno's parole board hearing, the trial court concluded: "In this particular case, after a thorough

review of all the applicable case law and the evidence that was provided before it, this Court is convinced beyond a reasonable doubt [Moreno] was a major participant *in the murder* of [Alonzo] and the act of [*sic*] reckless indifference to her life." (Italics added.)

Moreno filed a timely notice of appeal.

## II. DISCUSSION

Although he approaches it in several different ways, Moreno's primary argument on appeal is that the trial court's factual findings do not support a conviction under the current state of the law. Accordingly, he asserts that the trial court erred by denying his request for resentencing under section 1172.6 and the order must be reversed.

### A. *Relevant Legal Principles and Standard of Review*

In 2018, the Legislature passed Senate Bill 1427 and "made significant changes to the scope of murder liability for those who were neither the actual killers nor intended to kill anyone, including certain individuals formerly subject to punishment on a felony-murder theory." (*People v. Strong* (2022) 13 Cal.5th 698, 707 (*Strong*).) "Senate Bill 1437 significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*Strong*, at pp. 707–708.)

More specifically, Senate Bill 1437 amended section 189 to add subdivision (e), which provides:

> "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:
>
> "(1) The person was the actual killer.

10

"(2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

"(3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

In addition, "Senate Bill 1437 imposed a new requirement that, except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder. (§ 188, subd. (a)(3).) 'Malice shall not be imputed to a person based solely on his or her participation in a crime.' (*Ibid.*) One effect of this requirement was to eliminate liability for murder as an aider and abettor under the natural and probable consequences doctrine." (*People v. Curiel* (2023) 15 Cal.5th 433, 449 (*Curiel*).) Thus, as the law now stands, "[o]utside of the felony-murder rule, 'a conviction for murder requires that a person act with malice aforethought. A person's culpability for murder must be premised upon that person's own actions and subjective mens rea.' " (*Id.* at p. 448.)

Senate Bill 1437 also enacted current section 1172.6, which permits defendants "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" to file a petition requesting that their conviction be vacated on the grounds that they "could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3).) If the defendant makes the requisite prima facie showing, the trial court shall issue an order to show cause why the relief should not be granted and shall hold an evidentiary hearing to determine

11

whether to vacate the conviction at issue and resentence the defendant on any remaining counts.  (*Id.*, subds. (c), (d)(1).)

At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019.  The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion. . . .  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.  A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.  If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."  (§ 1172.6, subd. (d)(3).)

Where, as here, the trial court finds that the prosecution has met its burden to prove beyond a reasonable doubt that the defendant could have been convicted under the current law, we review the trial court's factual findings for substantial evidence and review the court's application of those facts de novo.  (*People v. Henley* (2022) 85 Cal.App.5th 1003, 1017 ; *People v. Wilson* (2023) 90 Cal.App.5th 903, 916.)  We review the record in the light most favorable to the judgment, and consider whether there is sufficient evidence of reasonable, credible, and solid value from which a reasonable

12

trier of fact could find the defendant guilty beyond a reasonable doubt. (*Henley, supra,* at p. 1017.) However, to the extent that our analysis turns on the application of the facts as found by the trial court to the law, our review is de novo. (*Ibid.*; *Wilson, supra,* at p. 916.) Thus, "where there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

## B. *The Trial Court's Factual Findings Do Not Support an Available Theory of Murder*

There is no dispute here that Moreno was not the actual perpetrator, or that it was Ocegueda that shot the victim, causing her death. Thus, Moreno cannot be convicted as the actual killer and, under section 188, subdivision (a)(3), as amended by Senate Bill 1437, malice cannot be imputed to Moreno based solely on his participation in the crime. That leaves three remaining theories under which Moreno's conviction can be maintained. To meet their burden under 1172.6, subdivision (d)(3), the prosecution had to prove beyond a reasonable doubt either that Moreno was guilty as a major participant in an underlying felony that acted with reckless indifference to human life; that he was guilty as a direct perpetrator of implied malice murder; or that he directly aided and abetted the murder with a shared intent to kill. (See *Curiel, supra,* 15 Cal.5th at p. 449; *Reyes, supra,* 14 Cal.5th at pp. 987–988; § 189, subds. (e)(2), (3).)

### 1. *The Trial Court's Finding That Moreno Knew That Ocegueda Intended to Murder Alonzo Precludes a Felony Murder Theory of Liability*

The prosecution pursued the first theory and argued that Moreno was a major participant *in the robbery* that acted with reckless indifference to human life. At the hearing, the prosecutor explained: "I believe the Court

understands the People's position as it relates to the evidence in this case as we sit here for this hearing. Specifically, that Mr. Moreno essentially has admitted everything the Court needs in order to find that he was a major participant in a robbery and acted with reckless indifference to [Alonzo's] life."

However, as Moreno correctly points out, the trial court's findings do not support a finding of guilty under the felony-murder theory of accomplice liability. This is because the trial court expressly repudiated Moreno's testimony that he believed that Ocegueda intended to commit robbery. The trial court repeatedly stated that it made "no sense" that Moreno would infer that Ocegueda intended to commit a robbery to "get back" at Alonzo. Rather, the court found that the only "logical alternative" was that Ocegueda needed "assistance to dispose of a vehicle" after committing an execution style murder.

Like most crimes, the crime of robbery requires the "union of act and either wrongful intent or criminal negligence." (*People v. Anderson* (2011) 51 Cal.4th 989, 994.) "The intent required for robbery has been described as the specific intent to deprive the victim of the property permanently." (*Ibid.*) "Thus, 'the act of force or intimidation by which the taking is accomplished in robbery must be motivated by the intent to steal.' " (*Ibid.*) An individual that commits a murder with the intent to steal is guilty of robbery, but where the perpetrator intends to kill the victim and the taking of property is merely incidental to the killing, the crime of robbery has not been committed. (See *People v. Marshall* (1997) 15 Cal.4th 1, 34–35 [overturning a robbery conviction where the defendant did not murder the victim *for the purpose* of obtaining the stolen item].)

14

Here, the trial court found made no findings establishing that either Ocegueda or Moreno intended to commit a robbery, or that they did so by killing Alonzo. Rather, the court found "beyond a reasonable doubt [that Moreno] was a major participant *in the murder* of [Alonzo] and the act of [*sic*] reckless indifference to her life." Murder is not an enumerated underlying felony for felony murder. And without an underlying felony, Moreno could not be liable for murder based on a felony-murder theory.

### 2. *The Trial Court Did Not Make Adequate Findings as to Any Other Still Valid Theory of Liability*

The conclusion that the trial court's findings do not support a felony murder theory of murder liability does not end our inquiry. The trial court also found, albeit in summary fashion, that Moreno "willingly participated *in the murder* of [Alonzo]." Accordingly, we consider whether the trial court's findings are sufficient to support a conviction under either an implied malice murder theory or a direct aiding and abetting theory. We conclude that they are not, primarily because the trial court did not make the requisite findings, either express or implied, under either theory.

As our high court recently explained, "[m]urder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " [Citation.] " ' "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' " (*Reyes, supra,* 14 Cal.5th at p. 988.)

The trial court's findings do not support an implied malice theory of murder liability as to Moreno. The trial court made no specific findings as to

15

any act undertaken by Moreno, and the evidence established only that he followed Ocegueda to a remote area and attempted to dispose of Alonzo's car after the murder occurred. There is no evidence, or finding, that Moreno "precipitated or provoked the shooting," that his act of following Ocegueda or disposing of the car was a proximate cause or substantial contributing factor to Alonzo's death, or that the murder would not have occurred if Moreno had not agreed to do the same. (See *Reyes, supra,* 14 Cal.5th at p. 989.) To the contrary, there was at least some evidence that Ocegueda had already asked at least one other individual to assist him, and thus, it is entirely feasible that he would have simply asked someone else if Moreno had refused. Regardless, there is no suggestion in the record before us that the trial court expressly considered this theory of liability.

Finally, we consider whether the trial court made adequate findings to support the conviction under a theory of aiding and abetting. " '[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea.' " (*Reyes, supra*, 14 Cal.5th at pp. 990–991.) "[A] person aids and abets the commission of a crime [in this case, murder] when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the *intent or purpose of committing, encouraging, or facilitating the commission of the offense*, (3) by act or advice that aids, promotes, encourages or instigates, the commission of the crime." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295–296, italics added.) Thus, as the People acknowledge, liability for an accomplice under an aiding and abetting theory requires both knowledge of the direct perpetrator's unlawful intent and an intent to assist the perpetrator in achieving his or her unlawful purpose. (See *Ibid.*; *People v. Gentile* (2020) 10 Cal.5th 830, 843.)

16

" 'In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act.  For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act.  Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life." (*Reyes, supra*, 14 Cal.5th at p. 991 (italics omitted), quoting *People v. Powell* (2021) 63 Cal.App.5th 689, 712–713.)  This theory differs from the now defunct natural and probable consequences theory because the latter "did not require that the aider and abettor intend to aid the perpetrator in committing a life-endangering act." (*Reyes*, at p. 991.)

"[A]ssuming the life-endangering act was the shooting, the trial court should have asked whether [Moreno] knew that [Ocegueda] intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Reyes, supra,* 14 Cal.5th at p. 992.)

The trial court did not ask those question or make those findings here.  Although its finding that Moreno "willingly participated *in the murder* of [Alonzo]" does at least suggest that he may have had been culpable under such a theory, the trial court did not go so far as to make the requisite findings as to Moreno's mens reus or actus reus.  Rather, the court made findings that Moreno was an active participant that acted with reckless indifference to human life, consistent with the robbery felony murder theory

17

of liability that the People relied upon. The People now assert, somewhat summarily, that substantial evidence supports "that [Moreno] knew Ocegueda intended to kill the victim, [Moreno] intended to assist Ocegueda, and then [Moreno] took action to promote that end," but they did not argue that position below, and they do not point to any findings by the trial court establishing the same.

Because it is " 'uncertain whether the trial court would have reached the same result using correct legal standards,' " we conclude that it is appropriate to remand the matter for a new hearing to determine whether the prosecution proved, beyond a reasonable doubt, that defendant is guilty under any of these alternative permissible theories. (*Reyes, supra,* 14 Cal.5th at p. 992; *People v. Arnold* (2023) 93 Cal.App.5th 376, 391.)[4]

---

[4] The parties disagree as to whether the trial court could have found Moreno guilty under a first-degree murder theory of liability, given that the jury found him guilty of only the lesser included offense of second-degree murder. Because we find that the trial court's findings do not support a conviction under any theory, we need not and expressly do not address this issue in the present appeal.

## III.    DISPOSITION

The order denying Moreno's petition for resentencing under section 1172.6 is reversed and the matter is remanded to the trial court with instructions to vacate the prior order denying the petition for resentencing and conduct a new hearing consistent with this opinion.

KELETY, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.